BOYD J. O'DONNELL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
O'Donnell v. Commissioner
Docket No. 6943-83
United States Tax Court
T.C. Memo 1991-74; 1991 Tax Ct. Memo LEXIS 89; 61 T.C.M. (CCH) 1967; T.C.M. (RIA) 91074; February 27, 1991, Filed *89 Decision will be entered under Rule 155. Theodore Arrowood, for the petitioner. [1]
Mary Schewatz, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioner's individual Federal income tax as follows: Addition to tax   Taxable Year
Deficiency
Section 6651(a)(1)
1978
$ 24,266
$ 1,193
1979
25,844    0  Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. Petitioner moved to amend his petition to place in issue whether he is entitled to increase the deductions for alimony claimed on his 1978 and 1979 *90 returns. We granted his motion. Additionally, respondent moved for leave to file an amended answer to set forth affirmative allegations that petitioner overstated his alimony deductions for 1978 and 1979, and to raise an addition to tax under section 6653(a) for negligence. We granted respondent's motion insofar as it related to the alimony deductions, and denied it insofar as it related to the negligence issue. Respondent also seeks to increase the deficiencies for 1978 and 1979 for failure to report gross receipts of $ 119 and $ 2,142.77, respectively. These increases were tried by consent of the parties under Rule 41(b). After concessions by both parties the issues for decision are (1) whether petitioner is entitled to alimony deductions in excess of $ 12 for each taxable year; (2) whether any portion of the $ 1,407.50 attorney's fees BIC paid in 1978 is income to petitioner; (3) whether petitioner's gross receipts for taxable years 1978 and 1979 should be increased by $ 119 and $ 2,142.77, respectively; and (4) whether petitioner is entitled to deduct any of the substantiated Schedule C expenses claimed in 1978 and 1979 under either section 162 or 212. Some of the facts *91 are stipulated and found accordingly. The stipulation of facts and accompanying exhibits are incorporated herein. Respondent mailed a joint statutory notice of deficiency to petitioner and his then second ex-wife Irene Blanc O'Donnell (Ms. Blanc) for the taxable years in issue. Ms. Blanc filed a separate petition with this court. Ms. Blanc's case was settled and is not part of this case. See Garfinkel v. Commissioner, 67 T.C. 1028 (1977); Dolan v. Commissioner, 44 T.C. 420 (1965). Petitioner resided in Westlake Village, California, at the time he filed his petition for redetermination in this Court. Sometime thereafter, petitioner filed a voluntary petition in bankruptcy. Accordingly, all proceedings in this case were stayed pursuant to section 362 of chapter 11 of the Bankruptcy Code. On September 21, 1987, the United States Bankruptcy Court, Central District of California, entered a Discharge of Debtor on behalf of petitioner. On December 3, 1987, the stay of petitioner's proceedings in this Court was lifted, and the case was restored to the general docket for disposition. For convenience the issues will be discussed seriatim. *92 ALIMONY PAYMENTS
FINDINGS OF FACT In 1951 petitioner married his first wife, Joan O'Donnell (Ms. O'Donnell). In 1953 their daughter was born. In 1972 they divorced. Petitioner did not pay child support to Ms. O'Donnell. However, before their divorce was final petitioner and Ms. O'Donnell entered into an oral private agreement whereby petitioner agreed to pay her $ 1,500 per month in alimony. The court's final decree of divorce did not, however, incorporate that private agreement. Instead, it provided that petitioner was to pay Ms. O'Donnell one dollar a month in alimony. In 1978 petitioner wrote checks totalling $ 15,000 to Ms. O'Donnell on his Regent Realtors sole proprietorship account at Valley National Bank. [2] In 1979 petitioner wrote checks totalling $ 13,500 to Ms. O'Donnell; $ 6,000 on the Valley National Bank account and $ 7,500 on his Regent Realtors sole proprietorship account with Wells Fargo Bank. Petitioner's 1978 Federal income tax return, prepared by York, Smith & Company, a CPA firm, indicates that he claimed a $ 3,000 alimony paid deduction. Petitioner's 1979 return, prepared by Bradley S. Brokop, a CPA, indicates that he claimed a $ 3,300 alimony *93 paid deduction. OPINION Section 215(a) provides a deduction for amounts paid by a taxpayer to a former spouse if the former spouse is required to include these amounts in gross income under section 71. Under section 71(a), a former spouse's gross income includes periodic payments received from the taxpayer (1) under a decree of divorce or separate maintenance, (2) under a written separation agreement, or (3) under a decree for support. Grant v. Commissioner, 84 T.C. 809, 821-822 (1985), affd. without published opinion 800 F.2d 260 (4th Cir. 1986). Additionally, section 71(a) requires a writing which memorializes the agreement between the former spouses concerning support obligations. Prince v. Commissioner, 66 T.C. 1058 (1976); Jefferson v. Commissioner, 13 T.C. 1092 (1949). [3] Only (1) and (3) are applicable herein, because petitioner and Ms. O'Donnell *94 were divorced during the years in issue. We find that the $ 1,500 payments were not imposed by the decree of divorce or a decree for support; the Superior Court's interlocutory judgment and final judgment entered October 26, 1972, provides for support payments of one dollar per month. Moreover, they were not incurred under a written instrument incident to such divorce; petitioner and Ms. O'Donnell never reduced their oral agreement to writing. Grant v. Commissioner, 84 T.C. at 823; Gordon v. Commissioner, 70 T.C. 525, 529 (1978). Neither petitioner's income tax returns, nor his checks to Ms. O'Donnell, are sufficient to constitute a written agreement. Gordon v. Commissioner, supra; Blanchard v. United States, 424 F. Supp. 916 (D. Md. 1976). Thus, petitioner was not legally obligated to make the $ 1,500 payments to Ms. O'Donnell and, therefore, is not entitled *95 to deduct in excess of $ 12 per year under section 215. ATTORNEY FEES
FINDINGS OF FACT In 1968 Ms. Blanc inherited 60 percent of the stock of Blanc Investment Company (BIC), a real estate investment company, from her deceased husband Ned Blanc. She later purchased, with her separate funds, the remaining 40 percent from her children. Before May 1, 1973, petitioner worked for BIC as its investment manager. On May 1, 1973, petitioner married Ms. Blanc. Thereafter, he continued to work for BIC as an outside consultant/manager, but never owned any stock in BIC. In 1975 petitioner was convicted of bankruptcy fraud in the Federal District Court in Phoenix, Arizona, and sentenced to a jail term. The conviction was affirmed. [4] In or around February 1977 petitioner retained the law firm of Hill Farrer & Burrill (the firm) to represent him in a matter relating to his conviction. The firm also represented BIC in some business matters.
*96 Petitioner, however, instructed the firm to issue all bills to BIC. Accordingly, all bills from the firm dated February 28, 1977, through June 30, 1977, were addressed to "Blanc Investment Co." to the attention of "Mr. Boyd J. O'Donnell, Personal." Those bills show BIC as the client, and that services were rendered on "Blanc-U.S.A. vs. O'Donnell, matter no. 84626." On April 3, 1978, a $ 407.50 check (no. 621) payable to Robert Rosenthal, [5] an attorney, was written on BIC's account with the reference to the "Wells case." Petitioner and Corinn A. Moret, BIC's secretary/bookkeeper during 1978 and 1979, signed this check. The "Wells case" reference refers to BIC's former secretary/bookkeeper Mabel Wells. [6] Ms. Wells gave testimony on either petitioner's or BIC's behalf sometime before April 1977. A bill from the firm to petitioner dated April 30, 1977, refers to Mabel Wells under "matter no. 84626, Blanc-U.S.A. vs. O'Donnell." *97 On May 3, 1978, a $ 1,000 check payable to Harry Hathaway (Mr. Hathaway), of Hill Farrer & Burrill, was written on BIC's account. Petitioner and Corinn A. Moret signed this check. There is no reference indicating what particular services the check paid for. Between May 3 and 9 of 1978, Mr. Hathaway or the firm rendered $ 200 in services on behalf of BIC on the City of Glendale Redevelopment Project (Glendale). On May 31, 1978, a bill for $ 232.25 was sent to "Blanc Investment Co." to the attention of "Mr. Boyd J. O'Donnell, Personal." The bill shows BIC as the client, the $ 200 as services rendered on "Blanc-Glendale Redev., matter No. 84626," and $ 32.25 as the previous balance. On September 16, 1978, BIC paid this bill in full. The only work Mr. Hathaway performed for either petitioner or BIC was the bankruptcy case and the Glendale project, respectively. He had never heard of the "Wells case." OPINION Petitioner conceded that BIC checks dated March 9, 1978, for $ 2,500 and April 17, 1978, for $ 1,500 payable to Mr. Hathaway are additional income to him, but contends that the $ 1,000 check written May 3, 1978, by BIC to Mr. Hathaway represented payment by BIC for services *98 rendered on the Glendale project, not his personal expenses. Respondent contends that BIC paid $ 1,000 of petitioner's personal expenses. Petitioner bears the burden of proving the amount was not applied to his personal expenses and, therefore, not income to him. Rule 142(a). The evidence on this particular issue is ambiguous. Petitioner testified that BIC was named as a codefendant with him in a civil proceeding, and that the $ 1,000 could have been a payment for the services rendered on behalf of BIC. He did not, however, produce any documentation to support this statement. On brief, petitioner stated that he thought the total billing for the Glendale project was in excess of $ 2,000, and that the $ 1,000 payment represents a payment on that project, rather than on his personal case. Although at least $ 200 worth of services was provided by the firm for BIC during 1978, we are not convinced that additional services were performed, or that the $ 1,000 was used to pay for those services. In support of respondent's position, Mr. Hathaway testified that this $ 1,000 payment was not applied to the work on the Glendale project, but rather to BIC's outstanding balance related *99 to the services rendered on behalf of petitioner in 1977. We accept his testimony. Accordingly, petitioner has not met his burden of proving that the $ 1,000 was not applied to his outstanding personal liability. We find in respondent's favor on this amount. We are, however, convinced that the $ 407.50 paid to Mr. Rosenthal on the Wells case was paid on behalf of BIC, rather than petitioner. Mr. Hathaway testified that he personally worked on petitioner's personal case, and he was not familiar with the Wells case. Thus, notwithstanding that the firm's April 1977 bill made reference to Mabel Wells, we are convinced that the "Wells case" is connected with BIC's activities, rather than petitioner's personal bankruptcy. Accordingly, we find in favor of petitioner on this amount. GROSS RECEIPTS
FINDINGS OF FACT Sometime before November 1, 1977, petitioner and Jay C. Johnson (Mr. Johnson) formed "Regent Realtors," a partnership (the partnership). Mr. Johnson owned 51.25 percent and petitioner owned 48.75 percent. The partnership maintained a separate checking account with Central Bank of Glendale, and during 1978 was operated out of BIC's offices at 301 W. Lexington Drive, *100 Glendale, California. Petitioner worked out of the partnership's or BIC's offices daily. On November 1, 1977, petitioner and Mr. Johnson on behalf of the partnership entered into a broker/management agreement with BIC. Ms. Blanc signed the agreement on behalf of BIC. The partnership's duties as broker for various commercial, residential, and industrial property owned by BIC were to rent, sell, maintain, and repair the properties for a 6-percent fee, $ 1,200 of which was paid monthly to the partnership, with any adjustments made at the end of each three-month period. BIC agreed to pay for all the partnership's telephone, rent, secretarial, and bookkeeping services for the offices they occupied jointly, in exchange for 30 percent of the commissions the partnership received. The partnership reported gross receipts of $ 30,325 for 1978, $ 17,162.15 of which was paid by BIC, and deductions of $ 3,342, [7] *101 resulting in net ordinary income of $ 26,983. Petitioner properly reported his share of $ 13,153 on his Schedule E for 1978. [8]
In addition to his activities in the partnership, petitioner was an outside consultant for BIC during 1978 and 1979. He was the only outside consultant hired and paid by BIC. During 1978 and part of 1979 petitioner maintained a separate bank account for this sole proprietorship at the Valley National Bank, under the name "Regent Realtors." During part of 1979 he maintained the account at the Wells Fargo Bank. During 1978 BIC reported on Form 1099-MISC that it paid petitioner $ 25,200 in return for his nonemployee/consulting services. Petitioner reported that amount on his Schedule C. However, BIC's disbursement journal indicates that BIC checks totalling $ 23,904.32 were written directly to petitioner, $ 1,155.35 representing reimbursed expenses. Additionally, the journal shows that BIC paid $ 2,570.03 of petitioner's expenses. Thus, during 1978, petitioner received $ *102 25,319 [9] from BIC, rather than the $ 25,200 reported. BIC's journal for 1979 shows that it paid $ 29,746.12 to Regent Realtors (the sole proprietorship) and $ 22,125 [10] to or on behalf of petitioner. Petitioner reported gross receipts of $ 49,685 [11] on his Schedule C for 1979. *103 OPINION Petitioner contends that he overreported his gross receipts in 1978 and 1979 by $ 1,672.08 [12] and $ 2,622.91, [13] respectively. Respondent alleges petitioner underreported his gross receipts by $ 119 and $ 2,142.77. Petitioner claims that BIC's disbursement journal entries are incorrect, especially the 1979 journal reflecting 7 payments of $ 406 to State Mutual Savings. Petitioner claims that those payments were applied to a deed of trust on property owned by BIC. We sustain petitioner's claim that $ 2,842 of the $ 5,813.33 expenses paid on behalf of petitioner are actually BIC's expenses, not petitioner's. Accordingly, *104 we adjust his 1979 income down to $ 46,835.77. We are not, however, convinced that the additional changes petitioner made to the journal entries for 1978 or 1979 are accurate. First, petitioner reported gross receipts of $ 49,685 on his 1979 Schedule C. We found he actually received, directly and indirectly, $ 46,835.77 from BIC. Secondly, petitioner admitted at trial [14] and on brief [15] that he received income from sources other than BIC during 1979. Thus, we can only conclude that petitioner received either $ 2,142.77, as respondent claims, or $ 2,849.23, as petitioner reported, from sources other than BIC. Without more, we are convinced petitioner properly reported his total gross receipts from all sources as $ 49,685. *105 Accordingly, we conclude petitioner underreported gross receipts in 1978 by $ 119 and properly reported gross receipts of $ 49,685 in 1979. SCHEDULE C EXPENSES
FINDINGS OF FACT On his 1978 Schedule C petitioner reported his business activity and name as "Management Consultant," and the product as "services." The business address was reported as 3801 Charthouse Circle, Westlake Village, California, petitioner's and Ms. Blanc's personal residence. However, petitioner primarily performed his consulting services out of the partnership's office located within BIC's offices. On his 1979 Schedule C petitioner reported his business activity as "Sales of Service," the product as "Real Estate," his business name as "Regent Realtors," and the business address as "213 N. Orange Street, Suite G, Glendale, CA." That address is the same as BIC's business address during 1979. Petitioner claimed a $ 27,470 [16] deduction in 1978 and a $ 37,200 [17] deduction in 1979 on his Schedules C. Respondent concedes that petitioner substantiated expenses of $ 16,919 in 1978 and $ 18,208 in 1979, but does not concede that these amounts are otherwise deductible under either section 162 or section 212. *106 OPINION Petitioner introduced a 9-page document detailing information relating to the 1978 joint tax return. Pages 2, 6, and 7 of the document contain various categories, check numbers, and *107 amounts of expenses for Regent Realtors. Petitioner did not introduce any checks written on his sole proprietorship account to support these expenses, although he did provide documentation for the partnership's expenses. The only checks introduced in support of the Schedule C expenses were those written on Ms. Blanc's personal accounts. Petitioner, however, stated numerous times on brief that all checks written on "their" personal accounts, including Ms. Blanc's accounts, were used to pay personal expenses, not Regent Realtors expenses. Thus, we have no choice but to find in favor of respondent on this issue for 1978. However, petitioner is entitled to the following Schedule C deductions in 1979: $ 1,450.00 legal fees, $ 12,363.92 [18] *108 commissions/management fees, $ 229.46 taxes, $ 382.39 advertising, $ 517.49 [19] office supplies [20] and miscellaneous expenses. Additionally, we find petitioner is not entitled to any "home/office" deductions for either 1978 or 1979. It is clear from the record petitioner did not use any portion of the personal residences exclusively and on a regular basis as his principal place of business. See sec. 280A(c)(1). Instead, most of his business activities were conducted out of the partnership's or BIC's offices. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Petitioner's counsel, Theodore Arrowood, entered an appearance on behalf of petitioner at trial, signed the stipulation of facts, and performed other services on behalf of petitioner with respect to this case. Mr. Arrowood did not sign petitioner's brief due to an illness. Thus, petitioner is currently representing himself even though Mr. Arrowood has not formally withdrawn as counsel.↩
2. Regent Realtors address per the checks is 301 W. Lexington Drive, Glendale, California.↩
3. See Brooks v. Commissioner, T.C. Memo 1983-304↩.
4. See United States v. O'Donnell, 539 F.2d 1233↩ (9th Cir. 1976).
5. It is not known whether Mr. Rosenthal was associated with the firm of Hill Farrer & Burrill.↩
6. Mrs. Wells was BIC's secretary/bookkeeper in 1977.↩
7. Commissions $ 2,227; dues $ 241; supplies $ 798; advertising $ 76.↩
8. He also claimed $ 2,932 in deductions on certain property located at 10622 Grevillen Avenue, Lennox, California ($ 342 for depreciation; $ 128 Insurance; $ 200 Interest; $ 1,793 repairs; $ 404 taxes; and $ 65 utilities).↩
9. Checks worth $ 23,904.32 were made out to petitioner. However, $ 1,155.35 of that amount represents reimbursed expenses. Petitioner did not include the reimbursed expenses in income. Additionally, BIC paid $ 2,570.03 of petitioner's expenses, which he did include in income.↩
10. $ 16,311.67 was paid directly to petitioner and $ 5,813.33 was paid on his behalf.↩
11. This figure includes the $ 29,746.12 gross receipts from Regent Realtors, plus $ 14,118.32, the difference between $ 16,311.67 and $ 2,193.35, plus the $ 5,813.33 expenses paid on behalf of petitioner by BIC. Thus, petitioner overstated his income by $ 7.23.↩
12. This figure represents the $ 25,200 amount shown on the 1099-MISC reduced by $ 23,527.92, the amount petitioner contends he actually received from BIC.↩
13. This amount represents petitioner's contention that he personally received $ 17,316.56 from BIC ($ 14,118.32 paid directly to him, plus $ 3,198.24 personal expenses paid by BIC), plus $ 29,745.53 paid by BIC to Regent Realtors.↩
14. At trial petitioner testified that Regent Realtors received $ 450 and $ 1700 commissions from outside sources, and that he paid 50 percent of those receipts as commissions to a Mr. Friedman, an outside broker, and a Mr. Dent, petitioner's salesman.↩
15. On brief, petitioner claims he was mistaken about the source of the $ 450 and $ 1,700 amounts, and contends that BIC paid both amounts. He, however, again admitted he received a small amount of income from sources other than BIC.↩
16. ↩
Amount Claimed
Amount Substantiated
Advertising
$    612
$    446
Automobile
164
180
Depreciation
2,150
2,150
Insurance
2,018
1,023
Legal
7,219
0 Office Supplies
119
83
Travel/Entertainment
12,117
9,933
Office in Home
3,071
3,104
$ 27,470
$ 16,919
17. ↩
Amount claimed
Amount Substantiated
Commissions
$  5,705.00
$  5,355.24
Interest
2,436.00
0  Legal Fees
1,605.00
1,450.00
Travel/Entertainment
7,622.00
5,436.00
Management Fees
10,247.00
5,355.24
Taxes
0  229.46
Advertising
281.00
382.39
Car/Truck
1,831.00
0 Dues/Publications
175.00
0  Insurance
234.00
0  Office Supplies
747.00
0  Postage
38.00
0  Telephone
619.00 0  Accounting
600.00
0  Equipment/Rental
2,280.00
0  Parking
81.00
0  Printing
2,699.00
0  $ 37,200.00
$ 18,208.33
18. Petitioner introduced checks totalling $ 11,940.42 that we conclude are commissions/management fees. However, two of those checks, numbers 114 and 134, were reduced by an advance already given to Mr. Walter Dent. Accordingly, there is an additional $ 423.50 petitioner is entitled to deduct, i.e., a total of $ 12,363.92. We point out that we did not include check number 113 in our calculation, since this could have been one of the advances we took into account above.↩
19. $ 152.49 office supplies and $ 365 salesman bonus/contest.↩
20. We are not allowing petitioner to deduct the $ 200 check payable to "cash."↩